1
2
3
4
**UNITED STATES DISTRICT COURT**

5
**DISTRICT OF NEVADA**

6
ESCO CORPORATION et al.,

7
        Plaintiffs,                2:12-cv-01545-RCJ-CWH

8
    vs.                                  **ORDER**

9
CASHMAN EQUIPMENT COMPANY et al.,

10
        Defendants.

11

12
       This case arises from Defendants' alleged infringement of multiple patents held by

13
Plaintiffs that relate to wear members used on excavating and mining equipment. In response,

14
Defendants have filed counter infringement claims based on patents owned by Defendants

15
Caterpillar, Inc. ("CAT") and Caterpillar Global Mining ("CGM"), as well as counterclaims for

16
inequitable conduct, patent misuse, and antitrust violations. Pending before the Court are

17
Plaintiffs' Motion to Dismiss (ECF No. 160), Motion to Strike (ECF No. 164), Motion to Sever

18
(ECF No. 165), Motion to Stay (ECF No. 166), and Motion for Reconsideration (ECF No. 179).

19
Defendants have submitted Responses to the Motions, (ECF Nos. 182, 186), and Plaintiffs have

20
replied, (ECF Nos. 188, 191).

21
**I.    FACTS AND PROCEDURAL HISTORY**

22
       Plaintiff ESCO Corporation ("ESCO") manufactures ground engaging tools that are

23
incorporated into heavy equipment. (Countercl. ¶ 8, ECF No. 137). Among these tools are wear

24

parts that are fastened to excavation and mining machinery in order to reduce the amount of direct contact the machinery has with the ground.  This allows the more expensive parts of the equipment, such as an excavation bucket, to last longer while the wear parts themselves are replaced once they have worn down.  Wear parts were traditionally installed and removed from ground engaging equipment using large hammers, which was both difficult and dangerous.  So to facilitate the process, ESCO designed wear parts that use hammerless locking systems.

These locking systems are covered by six of the patents-in-suit: U.S. Patent No. 7,178,274 ("the '274 patent"), U.S. Patent No. 7,640,684 ("the '684 patent"), U.S. Patent No. 8,122,621 ("the 621 patent"), U.S. Patent No. RE43,693 ("the '693 patent"), U.S. Patent No. 8,689,472 ("the '472 patent"), and U.S. Patent No. 5,241,765 ("the '765 patent").  ESCO Corp. owns each of these patents by assignment, with the exception of the '684 patent, which is held by Plaintiff ESCO Canada.  Though these systems employ different locking mechanisms, they each allow wear parts to be replaced without the use of a hammer.  These patents cover a number of ESCO's products including the Nemisys® tooth system.

Defendant CAT manufactures heavy equipment that is used in construction and mining. (Countercl. ¶ 8).  CAT also produces certain wear parts that incorporate a hammerless lock known as the CapSure® system, which is covered by U.S. Patent No. 7,762,015 ("the '015 patent"). (*Id.* ¶¶ 39, 56).  Defendant CGM owns U.S. Patent No. 6,565,146 ("the '146 patent"), which covers the design for a curved dump body to be used by haulage vehicles known as the "Mechanically Attached Wear Plate System." (*Id.* ¶ 57).  The Raptor Defendants manufacture and sell the Predator® system for heavy machinery and equipment, which allegedly utilizes a version of CAT's locking system.

On July 22, 2011, ESCO sent a letter to CAT claiming that CAT's CapSure® system might infringe the '684 patent, the '693 patent, and the application that issued as the '621 patent ("ESCO July 2011 Letter"). (*Id.* ¶ 39).  On January 21, 2012, CAT filed suit in the Central District of Illinois ("Illinois Action") seeking, among other things, declaratory judgement of noninfringement. (*Id.* ¶ 48).  On August 29, 2012, ESCO filed an action in the District of Nevada against CAT, CGM, Defendant Raptor Mining Products, and Defendant Cashman Equipment Company claiming that the CapSure®, MAWPS, and Predator® systems infringe its patents.

Meanwhile, ESCO sought dismissal of the Illinois Action, which was denied, but the case was transferred to this District on December 18, 2012. (*Id.* ¶ 52).  ESCO's infringement case was then consolidated with the Illinois Action.  After additional argument, motions, and orders regarding venue, this Court retained the consolidated actions.  On April 7, 2014, ESCO filed another lawsuit against Defendants asserting infringement of the '472 patent, which was ultimately consolidated with the other cases into a single action.

On February 9, 2015, the Court ordered that ESCO file an amended complaint setting out all causes of action related to the patents-in-suit.  The Amended Complaint ("AC") was filed on March 2, 2015 reflecting all claims asserted by ESCO against the various Defendants that had been alleged in the separately filed cases, which were subsequently consolidated.  On March 19, 2015, Defendants filed their Answers to the AC, including counterclaims.  In addition to claims for declaratory judgment of noninfringement and invalidity, Defendants included allegations that ESCO engaged in patent misuse (Count III) and inequitable conduct (Count IV, seventh affirmative defense), infringed on the '146 patent (Count V) and the '015 patent (Count VI), and violated the Sherman Act by practicing anticompetitive behavior (Count VII).[1]

---

[1] Similar counterclaims and defenses were raised by the Raptor Defendants. (*See* Answer, ECF No. 136).

1     On May 12, 2015, following a *Markman* hearing, the Court issued its order on claim

2 construction, construing some terms while leaving others to their plain and ordinary meaning.

3 (ECF No. 159).  The next day, ESCO filed the instant Motions to dismiss, strike, sever, and stay.

4 (ECF Nos. 160, 164, 165, 166).  The Motions seek dismissal of Defendants' counterclaims for

5 inequitable conduct, patent misuse, and anticompetitive behavior pursuant to Rule 12(b)(6) and

6 Rule 9(b).  It seeks to strike Defendants' affirmative defenses premised on these same allegations

7 pursuant to Rule 12(f).  If the antitrust counterclaim is not dismissed, however, ESCO requests

8 that it be severed from the other counterclaims and stayed, pending the outcome of the remaining

9 causes of action.  On June 9, 2015, ESCO also filed a Motion for Reconsideration on the Court's

10 *Markman* ruling arguing that the Court clearly erred in its construction of certain claims.

11 **II.**    **ESCO's Motions to Dismiss and Strike**

12     The Court first deals with ESCO's Motions to Dismiss and Strike.  Because it finds

13 dismissal warranted, the Court need not reach the question whether severing and staying the

14 antitrust claim is appropriate.

15     **A. Legal Standards**

16     **1. Rule 12(b)(6) Motion**

17     The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim is to test the

18 legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  The issue

19 is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer

20 evidence to support the claims. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997)

21 (quotations omitted).  To avoid a Rule 12(b)(6) dismissal, a complaint does not need detailed

22 factual allegations, but it must plead "enough facts to state a claim to relief that is plausible on its

23 face." *Clemens v. Daimler Chrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Bell*

24

*Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

Furthermore, the Federal Circuit has found the heightened pleading standard under Rule 9(b) applies to allegations of inequitable conduct, *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009), and antitrust violations based on fraud on the U.S. Patent and Trademark Office ("PTO"), *Medimmune, Inc. v. Genentech, Inc.*, 427 F.3d 958, 967 (Fed. Cir. 2005), *overruled on other grounds*, 549 U.S. 118 (2007). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," and it "requires identification of the specific who, what, when, where, and how" of the alleged fraud or inequitable conduct, *Exergen*, 575 F.3d at 1327. "Malice, intent, knowledge and other conditions of a person's mind may be allegedly generally," Fed. R. Civ. P. 9(b), but only if the pleadings "allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind," *Exergen*, 575 F.3d at 1327. The purpose of the specificity requirement is to give defendants notice of the particular misconduct "so they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (quotation marks and citation omitted).

### 2. Rule 12(f) Motion

Federal Rule of Civil Procedure 12(f) states that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The standard for properly pleading an affirmative defense does not rise to the same level of pleading a cause of action. *See Rockwell Automation, Inc. v. Beckhoff Automation, LLC*, 23 F. Supp. 3d

1  1236, 1241–42 (D. Nev. 2014).  Rather, "[t]he key to determining the sufficiency of pleading an

2  affirmative defense is whether it gives plaintiff fair notice of the defense." *Wyshak v. City Nat'l*

3  *Bank*, 607 F.2d 824, 827 (9th Cir. 1979).

4      **B. Discussion**

5      ESCO argues that Defendants counterclaims for inequitable conduct, patent misuse, and

6  antitrust violations should be dismissed for failure to state a claim upon which relief may be

7  granted or for failure to plead fraud with sufficient particularity.  Defendants respond that they

8  have met both the requisite plausibility and particularity standards to survive the instant Motions

9  and further argue that their pleadings provide ESCO and ESCO Canada (collectively, "ESCO")

10  with fair notice regarding the inequitable conduct and patent misuse affirmative defenses.  The

11  Court agrees with ESCO that the counterclaims and defenses are inadequately pled as explained

12  below.

13      **1. Inequitable Conduct**

14      Inequitable conduct arises when a patent applicant, or its representative, engages the PTO

15  with a lack of candor, good faith, or honesty. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178

16  (Fed. Cir. 1995); *see also* 37 C.F.R. § 1.56.  It is considered the "atomic bomb" of patent law

17  because "inequitable conduct regarding any single claim renders the entire patent

18  unenforceable." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1288 (Fed. Cir.

19  2011).  Inequitable conduct cannot be cured by reissue or reexamination, and "the taint of a

20  finding of inequitable conduct can spread from a single patent to render unenforceable other

21  related patents and applications in the same technology family."[2] *Id.*

22

23  _____
   [2] The alleging of inequitable conduct has been called the "plague" of patent law, and it is estimated that inequitable
24  conduct is raised as a counterclaim or affirmative defense in 80% of infringement cases. *Therasense*, 649 F.3d at
   1289.

To successfully plead inequitable conduct, the accused infringer must allege facts showing the plausibility of "but-for materiality" and "specific intent to deceive the PTO." *Id.* at 1290; *Exergen*, 575 F.3d at 1327 n.3.  As stated, the pleader must identify "the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen*, 575 F.3d at 1327.  "The relevant 'conditions of mind' for inequitable conduct include: (1) knowledge of the withheld material information or of the falsity of the material misrepresentation, and (2) specific intent to deceive the PTO." *Id.*  And while pleading on "information and belief" is permitted under Rule 9(b), the pleading must set forth "the specific facts upon which the belief is reasonably based." *Id.* at 1330.  There must be some factual assertion that the individual decided to "deliberately withhold [a material reference] from the relevant examiner." *Id.* at 1331.  Gross negligence will not suffice. *Therasense*, 649 F.3d at 1290.

Since inequitable conduct "is an equitable defense to patent infringement," *id.* at 1285, these pleading requirements would logically apply whether a defendant is asserting it as a counterclaim or an affirmative defense.  The Federal Circuit would surely frown on a defendant being allowed to "cast the shadow of a hangman's noose," *id.* at 1289, over infringement proceedings simply by alleging inequitable conduct as an affirmative defense rather than a counterclaim, thereby skirting the detailed pleading standard set out in *Exergen*.  Such a result would be unfair, despite the lower pleading standard for affirmative defenses generally. *Rockwell Automation*, 23 F. Supp. 3d at 1241–42 (requiring only "fair notice").

Accordingly, the Court finds that the *Exergen* pleading standards apply to both Defendants' counterclaim and their affirmative defense of inequitable conduct.[3]  Because the

---

[3] ESCO's Motions relate to both the CAT Defendants' counterclaim for inequitable conduct, (Count IV, ECF No. 137), as well as the Raptor Defendants' counterclaim for inequitable conduct, (Third Claim for Relief, ECF No. 136).  Upon review, there appears to be no substantive difference between the CAT Defendants' allegations and the Raptor Defendants' allegations.  Thus for simplicity, the Court will refer only to the CAT Defendants' counterclaim and refer to both the CAT and Raptor parties as "Defendants."

remedy for inequitable conduct is patent specific, *Therasense*, 649 F.3d at 1288, the Court will

proceed by evaluating the allegations as they relate to each patent-in-suit.

### (i) The '621 patent and the '472 patent

Defendants allege that ESCO's in-house patent attorney, Steven P. Schad, engaged in

inequitable conduct during the prosecution of both the '621 patent and its divisional, the '472

patent. (Countercl. ¶¶ 87–89).  There are three instances that Defendants identify in support of

their inequitable conduct claims.  First, they claim that the '684 patent, which Schad also

prosecuted, was a material prior art reference to both the '621 patent and the '472 patent, but that

Schad, with knowledge of the '684 patent and its materiality, failed to disclose it to the PTO

during prosecution of the '621 patent and the '472 patent.

> Specifically, the USPTO would not have allowed at least claim 1 of the '621
> patent if the '684 patent prior art reference had been disclosed or considered.  The
> '684 patent discloses a locking assembly for attaching a wear member to a
> support structure that involves an internally threaded pin retainer and an
> externally threaded pin.  The '621 patent likewise discloses a wear assembly that
> includes a lock consisting of a wedge and spool, analogous to the pin and pin
> retainer of the '684 patent, that have an external "threaded formation" and
> "spaced helical ridges" respectively such that the wedge is threaded to the spool
> so that it can be drawn into the lock assembly by turning the wedge with a wrench
> or other tool. ('621 patent at 11:54–56 and Fig. 34).

(Countercl. ¶ 98).  Defendants claim that this is evidence that the '684 patent anticipates at least

each claim limitation of claim 1 of the '621 patent, and by extension the '472 patent. (*Id.* ¶¶ 99–

100).

Second, Defendants allege that Schad also failed to disclose U.S. Patent No. 6,119,378 to

Pippins ("*Pippins*") during prosecution of the '472 patent. (*Id.* ¶ 102).  Defendants claim that

*Pippins* is material when read in combination with U.S. Patent No. 5,666,748 to Emrich

("*Emrich*") because it renders claims 1–20 of the '472 patent obvious.  According to Defendants,

Schad had knowledge of *Pippins* because it was disclosed by Schad during the prosecution of

other patents, namely the '684 patent, the '274 patent, and the '693 patent. (*Id.* ¶ 104).
Defendants allege that the '472 patent would not have issued had *Pippins* been disclosed because
in view of *Emrich*, the "lock-securing apparatus disclosed in claim 1" of the '472 patent is
especially obvious. (*Id.* ¶ 105).

And third, Defendants assert that on October 9, 2013 ESCO submitted Information
Disclosure Statements ("IDS") identifying 945 pages of non-patent literature that included
invalidity contentions raised by CAT.  On January 22, 2014, and February 11, 2014, ESCO again
submitted IDS in support of its application for the '472 patent.  The IDS allegedly identified
1,450 pages of litigation documents from an Australian opposition proceeding and patent
infringement litigation over the '621 patent. (*Id.* ¶ 109).  Defendants argue that the examiner did
not consider CAT's invalidity contentions regarding the '621 patent because Schad
"intentionally buried the relevant prior art by disclosing CAT's invalidity contentions alongside
hundreds of pages of nonpatent literature relating to a foreign opposition proceeding." (*Id.*
¶¶ 110–11).  Defendants claim that Schad purposefully disclosed such a volume of litigation
documents after the Notice of Allowance had issued in November 2013 because ESCO
"intended that the Examiner would not actually consider the documents given the voluminous
nature of the documents and timing of the disclosure." (*Id.* ¶ 112).

Although Defendants have alleged with some specificity the basis for their inequitable
conduct claim, the Court nevertheless finds that the allegations fail to reach the level of
particularity required under Rule 9(b) as outlined in *Exergen*.  To survive dismissal, the pleading
must "identify which claims, and which limitations in those claims, the withheld references are
material to, and where in those references the material information is found." *Exergen*, 575 F.3d
at 1329.  Failure to do so is "fatal" to the claim. *Id.* at 1330.

Defendants identify the '684 patent as well as *Pippin* to be withheld references, and they further identify claims within the '621 patent and the '472 patent to which the withheld references are allegedly material.  However, what Defendants fail to allege is where in the '684 patent and *Pippin* the material information is found.  There is not a single reference in the counterclaim to a specific portion of the prior art that is allegedly material.  General references to prior art as being material do not satisfy the "what" and "where" prongs of the Rule 9(b) analysis under *Exergen*.  In *Exergen* itself, the party asserting inequitable conduct claimed, similar to Defendants here, that a prior patent was material to the patentability of the patent at issue because it disclosed "a technique of scanning a radiation detector across a target to measure maximum emitted radiation . . . ." 575 F.3d at 1325.  The Federal Circuit held that such an allegation was not enough since it failed to make a connection between a particular claim in the prior art with a particular claim in the asserted patent. *Id.* at 1329.  Defendants have not pled this important specific connection. *C.f. Nomadix, Inc. v. Hospitality Core Servs. LLC*, No. CV 14-08256, 2015 WL 3948804, at *5 (C.D. Cal. June 29, 2015) (finding allegations sufficient where particular pages and lines of the *prior art* were cited along with the claims of the asserted patents).

Furthermore, under *Exergen*, the pleading must "identify the particular claim limitation, or combination of claim limitations, that are supposedly absent from the information of record. Such allegations are necessary to explain both 'why' the withheld information is material and not cumulative, and 'how' an examiner would have used the information in assessing the patentability of the claims." 575 F.3d at 1329–30.  While the counterclaim states that the '684 patent "would have been material to the USPTO's consideration of the application that matured into the '621 patent," (Countercl. ¶ 99), there is no particular claim or limitation from the '684

10

patent identified, as the patent is again referenced only generally. *See Prowess, Inc. v. RaySearch Labs., AB*, 953 F. Supp. 2d 638, 651 (D. Md. 2013) (finding allegations of materiality inadequate under *Exergen* where defendant failed to identify which patent claims in the prior art were relevant).

Defendants' allegations relating to *Pippin* are likewise lacking in specificity.  Despite claiming that *Pippin* when read in view of *Emrich* "renders obvious the teachings of the '472 patent," (Countercl. ¶ 105), Defendants do not identify what portions of *Pippin* or *Emrich* the examiner would have found material to reach a conclusion of obviousness. *Exergen*, 575 F.3d at 1329–30.  Indeed, the facts that are omitted from the pleadings are those that would demonstrate how the examiner would find obviousness given particular limitations included in *Pippin* and *Emrich*.  The Court, therefore, finds that the pleadings as to "why" and "how" are deficient.

Moreover, the counterclaim and corresponding affirmative defense insufficiently plead that Schad acted with the specific intent to deceive the PTO. *Id.* at 1330.  It is true that "knowledge" and "intent" may be pled generally; however, the pleading must include sufficient allegations to allow the court to "reasonably infer that a party acted with the requisite state of mind." *Id.* at 1327.  The allegations must plausibly support the inference that the individual made a "deliberate decision to withhold a known material reference." *Id.* at 1331 (citation omitted).

Defendants claim that Schad prosecuted both the '684 patent and the '621 patent and he thus had knowledge of the '684 patent and its materiality to the '621 patent. (Countercl. ¶ 96).  But "an intent to deceive cannot be inferred solely based upon the failure to disclose known information, even if it is highly material." *See iLife Techs. Inc. v. AliphCom*, No. 14-cv-03345-WHO, 2015 WL 890347, at *7 (N.D. Cal. Feb. 19, 2015) (citing *Optium Corp. v. Emcore Corp.*, 603 F.3d 1313, 1322 (Fed. Cir. 2010) ("[C]onsistent precedent has rejected the notion that the

materiality of a reference alone can suffice to prove deceptive intent.")); *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 1182, 1191 (Fed. Cir. 1993); *see also Therasense*, 649 F.3d at 1290 ("Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive."). Defendants offer no other facts from which the Court could reasonably infer the plausibility of their conclusory statement that Schad "intentionally" failed to disclose the '684 patent during the prosecution of the '621 patent.

Similarly, ESCO's disclosure of *Pippin* during the prosecution of the '684 patent, the '274 patent, and the '693 patent does not support the inference that Schad acted with intent to deceive. *Exergen*, 575 F.3d at 1331 ("The mere fact that an applicant disclosed a reference during prosecution of one application, but did not disclose it during prosecution of a related application, is insufficient to meet the threshold level of deceptive intent required to support an allegation of inequitable conduct."). There are no additional allegations related to Schad's failure to disclose *Pippins* that would allow the Court to reasonably infer bad faith.

The Court also finds that Defendants' allegations of "burying" do not support an inference of deceptive intent. The Court recognizes that the Federal Circuit caselaw is somewhat contradictory on the issue of whether allegations of "burying" can support the defense of inequitable conduct. *C.f. Molins*, 48 F.3d at 1184 (stating that "'burying' a particularly material reference in a prior art statement containing a multiplicity of other references can be probative of bad faith) *with Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1327 (Fed. Cir. 2000) (stating that "[a]n applicant can not be guilty of inequitable conduct if the reference was cited to the examiner, whether or not it was a ground of rejection by the examiner"). Regardless, "when

there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Therasense*, 649 F.3d at 1290–91.

Defendants concede that "[o]n October 9, 2013, ESCO submitted an [IDS] identifying 945 pages of non-patent literature, *including the invalidity contentions of Caterpillar regarding the '621 patent*." (Countercl. ¶ 107 (emphasis added)). The Notice of Allowance was subsequently mailed to ESCO on November 26, 2013. (*Id.* ¶ 108). The invalidity contentions, Defendants claim, contained material prior art references that were not considered by the examiner during the prosecution of the '472 patent because they were buried within the other 945 pages. Since it is undisputed that the disclosures were made by ESCO to the PTO, deceptive intent, if any, could only be inferred from the volume of the documents that were submitted contemporaneously with the invalidity contentions.

This inference proves too much. There are no facts alleged that negate an equally reasonable inference: that ESCO was attempting to avoid being accused of inequitable conduct for failing to disclose enough references. *See ParkerVision, Inc. v. Qualcomm Inc.*, 924 F. Supp. 2d 1314, 1318 (M.D. Fla. 2013) (finding this inference as "equally if not more reasonable" than an inference of deceptive intent). And while there may be certain instances when "burying" does support the inference of deceptive intent, the facts as currently alleged do not convince the Court that such an inference is warranted here. *See Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 749 F. Supp. 2d 892, 903 (W.D. Wis. 2010) (recognizing the possibility of a "burying" inequitable conduct claim, but agreeing "merely burying material reference in a long list of citations is unlikely to support [such] a claim").

In any event, it appears from information currently in the record that the examiner of the '472 patent actually did consider both the '684 patent and CAT's invalidity contentions when he

1   reviewed the October 2013 IDS. (*See* Oct. 9, 2013 IDS, ECF No. 139-13, at 164–67 (stating

2   "ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH" at the bottom of

3   each IDS page along with examiner's signature)).  An inference that Schad deliberately decided

4   to mislead the PTO by burying these material references would therefore be in error without

5   additional factual support. *Molins*, 48 F.3d at 1172 (finding clear error where district court

6   inferred deceptive intent on allegation of burying where "examiner initialed each reference,

7   indicating his consideration of the same, and stated that he had considered all of the cited prior

8   art").  For these reasons, the Court finds that Defendants fail to adequately plead inequitable

9   conduct as to the '621 patent and the divisional '472 patent.  However, leave will be given for

10  Defendants to amend their pleadings to correct the identified deficiencies.

### (ii) The '765 patent

12          Defendants allege that ESCO engaged in inequitable conduct during the prosecution of

13  the '765 patent when Schad "intentionally and with intent to deceive" failed to disclose U.S.

14  Patent No. 4,501,079 to Hahn and Jones ("*Hahn*"). (Countercl. ¶ 116).  Defendants claim that

15  *Hahn* was known to Schad because he cited it "during the prosecution of the parent to the '765

16  patent." (*Id.* ¶ 117).  Defendants claim that the '765 patent would not have issued had *Hahn* been

17  disclosed. (*Id.* ¶ 120).

18          This claim fails as a matter of law.  As ESCO points out, the Manual of Patent Examining

19  Procedure ("MPEP") unambiguously states that "[w]hen filing a continuing application that

20  claims benefit under 35 U.S.C. [§] 120 to a parent application . . . it will <u>not</u> be necessary for the

21  applicant to submit an information disclosure statement in the continuing application that lists

22  the prior art cited by the examiner in the parent application . . . . The examiner of the continuing

23  application will consider information which has been considered by the Office in the parent

24

application." MPEP § 609.02.  In light of § 609.02, the Federal Circuit has held that "it can not be inequitable conduct for an applicant not to resubmit, in the divisional application, the information that was cited or submitted in the parent application." *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 547 (Fed. Cir. 1998).

Since Defendants do not allege any additional conduct that they claim was inequitable in relation to the prosecution of the '765 patent, the claim must be dismissed.  The Court finds that amendment would be futile and therefore does not grant leave to amend as to this patent. *See DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

### (iii) The '274 patent

Defendants allege that Schad "intentionally and with intent to deceive" failed to disclose U.S. Patent No. 5,709,043 to Jones et al. ("*Jones*") during prosecution of the '274 patent. (Countercl. ¶ 123).  Defendants claim that Schad knew of *Jones* because he prosecuted both the '274 patent and *Jones*, and one of the inventors of *Jones*, Robert Emrich, is also a named inventor of the '274 patent. (*Id.* ¶ 124).  Defendants further allege that:

> ESCO represented to the USPTO during prosecution of the '274 patent that the prior art had not addressed the problem of a lock designed to have a constant axial length and to hold a wear member on a base free of axial pressure.  To the contrary, [*Jones*] and other prior art references known to ESCO at the time of the prosecution of the '274 patent, disclose a lock mechanism comprising a non-rotating resilient part that engages the shank of the locking member to resist turning and a locking member that rotates free of axial translation between a release position and a locking position.

(*Id.* ¶¶ 126–27).  Defendants state that if the claims of the '274 patent are as broad as ESCO claims, then the names of the actual inventors were withheld with deceptive intent, and the '274 patent would not have issued had the examiner considered *Jones*. (*Id.* ¶¶ 128–29).

These allegations do not rise to the level of specificity required under *Exergen*.  The citations both to the prior art and the asserted patent are made only generally without reference to

15

any particular claims.  As stated above, even a description of what the prior art covers and how it anticipates the asserted patent is insufficient to adequately plead materiality absent identifying "which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found . . . ." *Exergen*, 575 F.3d at 1329.

The "why" and "how" are also deficient.  Defendants state that *Jones* is "material" and that its lock assembly is what the '274 patent tries to cover as well. (Countercl. ¶¶ 125–27). However, simply stating that a reference is material is insufficient even at the pleading stage. *Exergen*, 575 F.3d at 1329. The allegations must go on to explain why the information is material and not cumulative and how the examiner would have used the information in assessing patentability. *Id.* at 1329–30.  This is done by identifying "particular claim limitations, or combination of claim limitations, that are supposedly absent from the information of record." *Id.* at 1329.  As *Exergen* itself demonstrates, referring to what is disclosed in a particular patent as anticipatory of what is disclosed in an asserted patent does not satisfy Rule 9(b) without references to particular claim limitations. *Id.* at 1325, 1329–30.

The Court is satisfied that knowledge is properly pled, as it stands to reason that Schad would be aware of a previous patent he himself prosecuted that involved the same inventor. *See Nomadix*, 2015 WL 3948804, at *5 (finding plausible that the lawyer charged with engaging in patent prosecution for the company would be aware of the contents of the company's other patent applications).  Nevertheless, the facts contained in the pleading do not support an inference that Schad acted with the necessary culpable intent.

Defendants essentially allege that Schad acted with deceptive intent because he had knowledge of *Jones*, knew *Jones* was material to the application that became the '274 patent, but

did not disclose *Jones* during prosecution.[4]  (Countercl. ¶¶ 123–25, 128).  This is not enough.

Intent to deceive cannot be inferred "solely from the fact that information was not disclosed,"

even if the reference is known to be material by the allegedly culpable individual. *Optium Corp.*,

603 F.3d at 1321.  Rather, there must be an independent factual basis for a finding or an

inference of deceptive intent. *Id.*  The current pleading does not provide the Court with this basis

and as such must be dismissed.  However, leave is granted for Defendants to amend the pleading

in order to correct the issues identified here, if possible.

### (iv) The '693 patent

The '693 patent is a reissue of U.S. Patent No. 7,640,685 ("the '685 patent") and a

continuation of the '274 patent. (Countercl. ¶¶ 131–32).  Defendants allege that Schad

"intentionally and with intent to deceive the USPTO" failed to disclose U.S. Patent No.

7,162,818 to Ruvang et al. ("*Ruvang* '818 reference") and U.S. Patent No. 6,108,950 to Ruvang

et al. ("*Ruvang* '950 reference") during the prosecution of the '685 patent and the '693 patent.

(Countercl. ¶ 134).  Defendants allege that "ESCO and its attorneys" knew of these references

since the '274 patent lists Robert Emrich as an inventor, just as the *Ruvang* '818 reference and

the *Ruvang* '950 reference do. (*Id.* ¶ 135).  Defendants claim that "ESCO and its attorneys knew

or should have known of the *Ruvang* '818 reference because of the extensive arguments and

appeals made by ESCO during prosecution of the '274 patent to avoid the *Ruvang* '950

reference." (*Id.* ¶ 136).

---

[4] Even this summation is generous to Defendants because they do not actually allege that Schad had such knowledge; rather, they claim that "[*Jones*] was known to *ESCO* and its attorneys at least because ESCO is the assignee of [*Jones*]." (*Id.* ¶ 124 (emphasis added)).  Defendants fail to stake the additional step of specifically alleging that Schad knew *Jones*, though the inference is expected since "both [*Jones*] and the '274 patent were prosecuted by Steven P. Schad and Banner & Witcoff." (*Id.*).  The Federal Circuit denied the inequitable conduct claims in *Exergen* precisely because the pleading referred "generally to 'Exergen, its agents and/or attorneys'" instead of identifying a particular person "who both knew of the material information and deliberately withheld or misrepresented it." 575 F.3d at 1329.  Therefore, Defendants failure to actually allege that Schad is the one who both knew of *Jones* and deliberately withheld the reference is additional grounds for dismissal.

These allegations suffer from the same deficiencies as those discussed previously. Defendants fail to plead with the requisite particularity the "where," "what," "why," and "how" as outlined in *Exergen*.  Defendants do not identify any particular claims in the '693 patent, or the '274 patent and '685 patent, to which the material references are relevant, nor do they allege where in the *Ruvang* references the material information is found. *Exergen*, 575 F.3d at 1329. Furthermore, Defendants fail to identify which particular claim limitations are absent from the record or how the examiner would have used them. *Id.* at 1329–30.

Likewise, Defendants cannot establish the plausibility of deceptive intent based on the facts currently alleged.  Knowledge of the *Ruvang* '950 reference may be reasonably inferred based on its inclusion by Schad during the prosecution of the '274 patent.  However, as stated previously, an applicant is under no obligation and is in fact instructed not to include prior art references in divisional applications if the reference is cited to during the prosecution of the parent application. MPEP § 609.02.  According to Defendants, ESCO, and presumably Schad, made "extensive arguments and appeals" during the prosecution of the '274 patent to avoid the *Ruvang* '950 reference. (Coutnercl. ¶ 136).  Since the *Ruvang* '950 reference was cited during prosecution of the '274 patent and, per Defendants, the '274 patent is the parent of the '693 patent, (*see* Countercl. ¶ 132), Schad could not have committed inequitable conduct by failing to include the *Ruvang* '950 reference during prosecution of the '693 patent. *ADT*, 159 F.3d at 547.[5]

---

[5] Defendants also allege that the '693 patent "would not have issued over the *Ruvang* '950 reference but for ESCO disclaiming the breadth of interpretation of the scope of its claims that it now attempts to recapture." (Coutercl. ¶ 138).  This statement is somewhat confusing.  Partial basis for Defendants' inequitable conduct claim as it refers to the '693 patent is that ESCO, through Schad, deliberately withheld the *Ruvang* '950 reference but in this portion of the pleading it appears as though Defendants are alleging that the reference was disclosed and that ESCO overcame it only by limiting the interpretation of the scope of its claims.  If this is true, the fact that ESCO is now attempting to broaden the scope of its claims would not amount to inequitable conduct on the PTO and instead would be an issue relevant to infringement and invalidity.  Anyhow, the inequitable conduct claim cannot stand on the allegations asserted.

As to the *Ruvang* '818 reference, the Court is not convinced that even an inference of knowledge is warranted. Defendants allege that "ESCO and its attorneys knew or should have known of the *Ruvang* '818 reference because of the extensive arguments and appeals made by ESCO during prosecution of the '274 patent to avoid the *Ruvang* '950 reference." (Coutnercl. ¶ 137). First, there is no indication of who should have known of the reference's materiality. Unlike other allegations contained in the pleading that allow for a quick inference that Schad is the individual being imputed with knowledge, this particular assertion does not necessarily implicate him. *Exergen* requires more. *See* 575 F.3d at 1329 (finding that simply alleging "Exergen, its agents and/or attorneys" was deficient because it did not allege "who both knew of the material information and deliberately withheld or misrepresented it").

But even if the Court assumes that Defendants are referring to Schad, there are no independent allegations of knowledge of the *Ruvang* '818 reference detached from the *Ruvang* '950 reference. Defendants would have knowledge of one reference imputed to Schad based on his knowledge of another. While it is possible that Schad's knowledge and familiarity with the *Ruvang* '950 reference led him to know the *Ruvang* '818 reference, the Court is not convinced based on these facts that the inference is necessarily plausible.

Irrespective of knowledge, though, there are no facts that indicate that Schad acted with an intent to deceive the PTO. Assuming Schad knew of both *Ruvang* references, that knowledge alone cannot be interpreted as deceptive intent. *Optium Corp.*, 603 F.3d at 1321. The pleading does not contain any additional facts on which an inference of intent to deceive could be reasonably based. *Exergen*, 575 F.3d at 1330. The inequitable conduct claim as to the '693 patent is dismissed, but leave to amend is granted.

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

(v) **The '684 patent**

Defendants allege that Schad "intentionally and with intent to deceive" failed to disclose U.S. Patent No. 2,688,475 to Small ("*Small*") in view of U.S. Patent No. 6,406,236 to Olson ("*Olson*") during prosecution of the '684 patent. (Countercl. ¶ 141). But the parties appear to be in agreement that these references were actually disclosed to the PTO during prosecution of the '684 patent, (*see* Mot. to Dismiss 15, ECF No. 160; Resp. 11, ECF No. 182), which is also supported by facts currently in the record, (*see* ECF No. 139-2, at 180).

Defendants, however, now argue that the basis for their inequitable conduct claim as it relates to the '684 patent is not that the *Small* reference was not disclosed, but rather that ESCO through Schad "misled the Examiner regarding the scope of the application that matured into the '684 patent." (Resp. 11). Although misrepresentation of material information with specific intent to deceive the PTO is grounds for finding inequitable conduct, *Therasense*, 649 F.3d at 1287, the pleading does not allege that ESCO misrepresented or misled the PTO, it claims that Schad failed to disclose *Small*. (*See* Countercl. ¶ 145 (alleging that the '684 patent would not have issued had ESCO not "intentionally withh[e]ld[] [*Small*]")). For this reason alone, the Court finds that the claim should be dismissed.

Moreover, it appears from the pleadings that Defendants allege inequitable conduct because ESCO "*now* contends that the '684 patent discloses a pin retainer that experiences deformation" where allegedly during prosecution ESCO claimed no deformation. (Countercl. ¶ 143–44; *see also id.* ¶ 145). The Court fails to see how this can be a basis for inequitable conduct "before the PTO" as it relates to the "filing and prosecution of a patent application." *Exergen*, 575 F.3d at 1327 n.3. It is unclear how exactly ESCO's interpretation of scope after a patent has issued necessarily relates to inequitable conduct during prosecution. On the other

1  hand, if ESCO made certain arguments regarding the scope of claims and limitations during

2  prosecution, those arguments are certainly relevant to subsequent claim construction, and

3  potentially to a patent's validity.  But the Court does not see the contentions as relevant to the

4  current counterclaim on the facts as alleged.

5         Finally, Defendants allege that "ESCO and its attorneys knew or should have known of

6  [*Small*] in view of [*Olson*] through ESCO's prosecution of U.S. Patent No. 9,959,506, which is

7  the parent to the '684 patent," (Countercl. ¶ 142), during the prosecution of which ESCO

8  proffered arguments "in order to overcome a rejection based on the [*Small*] and [*Olson*]

9  references," (*id.* ¶ 143).[6]  If *Small* was submitted during the prosecution of the '684 patent's

10  parent, it did not have to be included during prosecution of the '684 patent itself. MPEP §

11  609.02.  Conformity with this rule does not support an inequitable conduct claim. *ADT*, 159 F.3d

12  at 547.  The Court dismisses the claim as to the '684 patent without leave to amend.

13         In sum, Defendants fail to adequately plead inequitable conduct as to any of the five

14  asserted patents, and the court dismisses the CAT Defendants' Count VI and seventh affirmative

15  defense, as well as the Raptor Defendants' Third Claim for Relief and seventh affirmative

16  defense.  The Court, however, finds that the deficiencies in some of the allegations could be

17  corrected through amendment.  As such, leave to amend on the parties' claims and defenses is

18  granted for conduct allegedly arising from prosecution of the '621 patent, the '472 patent, the

19  '274 patent, and the '693 patent.  The allegations based on prosecution of the '765 patent and the

20  '684 patent are dismissed with prejudice.

21  ///

22

23  [6] Defendants also have a problem with the specificity with which the "who" is alleged in relation to their inequitable conduct claim as asserted under the '684 patent.  Presumably Defendants maintain that Schad is responsible, but the claim only references him once and then departs to instead reference only generally "ESCO and its attorneys." (Countercl. ¶ 142–45).  *Exergen* requires more. 575 F.3d at 1329.

24

21

1

2. **Patent Misuse**

2          "Patent misuse is an equitable defense to patent infringement." *U.S. Philips Corp. v. Int'l*

3   *Trade Comm'n*, 424 F.3d 1179, 1184 (Fed. Cir. 2005).  The Federal Circuit has "characterized

4   patent misuse as the patentee's act of 'impermissibly broadening the physical or temporal scope

5   of the patent grant with anticompetitive effect.'" *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d

6   1318, 1328 (Fed. Cir. 2010) (en banc) (citing *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995,

7   1001 (Fed. Cir. 1986)).  The patent misuse doctrine is "grounded in the policy-based desire to

8   'prevent a patentee from using the patent to obtain market benefit beyond that which inheres in

9   the statutory patent right.'" *Id.* (quoting *Mallinckrodt v. Medipart, Inc.*, 976 F.2d 700, 704 (Fed.

10  Cir. 1992)).

11         Certain practices have been identified as constituting *per se* patent misuse, such as

12  "'tying' arrangements in which a patentee conditions a license under the patent on the purchase

13  of a separable, staple good, and arrangements in which a patentee effectively extends the term of

14  its patent by requiring post-expiration royalties." *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d

15  860, 869 (Fed. Cir. 1997) (internal citations omitted).  But other practices can set up the defense

16  as well. *Id.*  Thus, the "key inquiry" in the patent misuse doctrine is whether "the patentee has

17  impermissibly broadened the physical or temporal scope of the patent grant and has done so in a

18  manner that has anticompetitive effects." *Princo*, 616 F.3d at 1328.

19         However, Congress has identified certain practices that are statutorily exempt from

20  allegations of patent misuse. *See* 35 U.S.C. § 271(d).  In particular, a patent owner is not deemed

21  guilty of misuse or illegal extension of the patent right when it "[seeks] to enforce [its] patent

22  rights against infringement or contributory infringement." *Id.* § 271(d)(3); *see also Va. Panel*,

23  133 F.3d at 870.  And "the catalog of practices labelled 'patent misuse' does not include a

24

1   general notion of 'wrongful' use." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1373 (Fed.

2   Cir. 1998).  The Court again proceeds by addressing the allegations patent by patent.[7]

3                               **(i) The '684 patent**

4           In their counterclaim and affirmative defense, Defendants allege that ESCO engaged in

5   patent misuse when ESCO sent a letter to CAT discussing the potential infringement of the '684

6   patent, allegedly misrepresenting that ESCO Corp. rather than ESCO Canada was the owner of

7   the '684 patent. (Countercl. ¶¶ 43, 76).  By so doing, Defendants argue, ESCO attempted to

8   expand the scope of ownership of the '684 patent. (*Id.* ¶ 76).

9           The Court does not find this allegation to be grounds for patent misuse.  The ESCO July

10  2011 Letter, which is attached to Defendants' pleading, is written "[o]n behalf of ESCO" and

11  does not differentiate ownership of the various patents discussed therein.  ESCO Corp.'s failure

12  to identify the '684 patent as being owned by ESCO Canada does not rise to the level of conduct

13  that the patent misuse doctrine is designed to prohibit.  First, there is no indication that ESCO

14  Corp. and ESCO Canada are so unrelated that simply informing CAT that an "ESCO" patent is

15  potentially being violated is untrue.  To the contrary, Defendants concede that the Letter "was

16  sent on behalf of both ESCO Corp. and ESCO Canada" and that Schad "had authority from

17  ESCO Canada to send the ESCO July 2011 Letter." (Countercl. ¶¶ 45–46).  Simply referring to

18  all the patents discussed in the letter as "ESCO" patents was neither misleading nor dishonest.

19          Second, Defendants plead no facts that demonstrate that ESCO's failure to specifically

20  identify the '684 patent as held by ESCO Canada instead of ESCO Corp. itself had

21  anticompetitive effects. *Princo*, 616 F.3d at 1328.  Regardless of which ESCO entity owns the

22  ─────────────────
    [7] Both the CAT and Raptor parties assert patent misuse as an affirmative defense. (CAT Defendants' sixth
23  affirmative defense, ECF No. 137; Raptor Defendants' sixth affirmative defense, ECF No. 136).  The CAT
    Defendants additionally assert patent misuse as a counterclaim. (CAT Defendants' Count III).  The overall substance
    of the allegations is nearly identical, so the Court will conduct its analysis by referring to the allegations contained in
24  the CAT Defendants' counterclaim and affirmative defense.

                                        23

1    '684 patent, the substance of the ESCO July 2011 Letter remains the same—namely, ESCO

2    believes that Defendants are infringing the '684 patent.  It is not as if ESCO Corp. was

3    attempting to hide the true owner of the '684 patent from CAT so that Defendants would be left

4    in the dark as to who held the right to enforce the patent.  Rather, Schad, speaking with authority

5    from all relevant ESCO entities, informed CAT that ESCO, as a company generally, was

6    concerned with possible infringement.  This allegation, therefore, does not support the misuse

7    counterclaim or defense.

8                               **(ii) The '472 patent**

9          Defendants next allege that ESCO engaged in patent misuse by "prosecut[ing] and

10    obtain[ing] the '472 patent by means of inequitable conduct before the USPTO, solely for the

11    purpose of asserting it against the Defendants." (Countercl. ¶ 77).  Defendants argue that ESCO

12    prosecuted the '472 patent "*after* the CapSure® technology was first sold, after the instant

13    litigation was initiated, and after ESCO received Defendants' non-infringement and invalidity

14    contentions regarding the '621 patent, of which the '472 patent is a divisional." (Resp. 20).  They

15    contend that this "is sufficient to bring Defendants' patent misuse defense as to the '472 patent

16    within the sham litigation variety of patent misuse . . . ." (*Id.*; *see also* Countercl. ¶¶ 39, 54).

17          The Court has found Defendants' pleadings regarding inequitable conduct insufficient.

18    Because the pleading as to patent misuse for the '472 patent rests largely on ESCO's alleged

19    inequitable conduct pertaining thereto, dismissal is warranted on the misuse claim as well.  After

20    all, "[i]t is not patent misuse to bring suit to enforce patent rights not fraudulently obtained." *C.R.*

21    *Bard*, 157 F.3d at 1373.  Accordingly, if Defendants are unable to properly allege or prove that

22    ESCO obtained the '472 patent through fraud on the PTO, the patent misuse claim would fail.

23    *See* 35 U.S.C. § 217(d)(3).  Obtaining a patent for the purpose of asserting it against a

24

competitor, without the additional element of bad faith, cannot support a claim for patent misuse. *See Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1558 (Fed. Cir. 1995).

In dismissing the claim, the Court must determine whether leave should be granted to amend. As at least one other court has noted, "the Federal Circuit has not given clear guidance as to whether a patent misuse defense can be premised on patent enforcement." *Nalco Co. v. Turner Designs, Inc.*, No. 13-cv-02727 NC, 2014 WL 645365, at *10 (N.D. Cal. Feb. 19, 2014). Indeed, the query nagging at the Court is whether pursuing an infringement claim, even if premised on bad faith, sufficiently relates to the use of the physical and temporal scope of the patent, *Princo*, 616 F.3d at 1328, especially considering the express statutory exception contained in § 271(d)(3). In other words, does filing an infringement action allow the patentee to "obtain a market benefit" beyond the scope of the patent grant such that the lawsuit is the type of "leveraging" to be prohibited by the patent misuse doctrine? *See Princo*, 616 F.3d at 1328.

Defendants cite *Cadence Pharmaceutical, Inc. v. Paddock Laboratories, Inc.*, No. 11-733-LPS, 2012 WL 4565013, at *2 (D. Del. Oct. 1, 2012), for the proposition that sham litigation, or litigation brought in bad faith, constitutes patent misuse. There, the district court stated that "[f]iling of a suit for patent infringement can constitute patent misuse if the suit was filed in bad faith . . . ." *Id.* The court referenced *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60–61 (1993), a Supreme Court decision, as supportive of this position.

However, *Real Estate Investors* dealt with the "sham" exception to the doctrine of *Noerr-Pennington* antitrust immunity; it was not a patent misuse case. And while it is clear that sham litigation may constitute an antitrust violation, *Real Estate Investors*, 508 U.S. at 62, it is less

1  clear that it would necessarily also establish a patent misuse defense, though Federal Circuit

2  cases allude to the possibility, *see C.R. Bard*, 157 F.3d at 1373 (stating that it is not patent

3  misuse to sue to enforce patent rights "not fraudulently obtained" and thereby implying that it

4  might be patent misuse to sue if the rights *were* fraudulently obtained); *Va. Panel*, 133 F.3d at

5  870 (finding that seeking injunctions against alleged infringer's customers did not constitute

6  patent misuse because patentee had a "good faith belief" that patent was infringed); *Glaverbel*,

7  45 F.3d at 1558 ("The bringing of a lawsuit to enforce legal rights does not of itself constitute

8  violation of the antitrust laws or patent misuse; there must be bad faith and improper purpose in

9  bringing the suit, in implementation of an illegal restraint of trade.").

10        Traditionally, patent misuse has related to how the patentee used its patent in

11  commerce—i.e. in the market place, such as in the granting of licenses. *Princo*, 616 F.3d at

12  1326–27; *C.R.Bard*, 157 F.3d at 1373 ("Although the law should not condone wrongful

13  *commercial* activity, the body of misuse law and precedent need not be enlarged into an

14  open-ended pitfall for patent-supported *commerce*.") (emphasis added).  The defense applied

15  when the scope of the patent was expanded beyond what had been granted by the PTO, such as

16  demanding royalty payments after the expiration of the patent. *Princo*, 616 F.3d at 1327.  But

17  here, Defendants would apply the defense to the assertion of a patent in an infringement action,

18  which would appear to be statutorily exempt from the misuse defense. *See* 35 U.S.C. § 217(d)(3).

19  Thus, whether "use" must mean "use in commerce" or whether any type of "use" of the patent,

20  including filing an infringement suit with bad faith, gives rise to the patent misuse defense is a

21  question of interest to the Court. *See Princo*, 616 F.3d at 1331 (finding patent misuse

22  inapplicable where there was "no 'use' of the patent").

23

24

In any event, the Court at this point is willing to follow the trend among district courts to allow such a defense "so long as the defendant can allege facts to plead 'bad faith and improper purpose.'" *Nalco*, 2014 WL 645365, at *10 (citing *Glaverbel*, 45 F.3d at 1558). To plead misuse based on the attempted enforcement of a patent, Defendants "must plead facts to support a reasonable inference that [ESCO] (1) 'acted with bad faith and improper purpose in bringing the suit,' and (2) 'impermissibly broadened the scope of the patent grant with anticompetitive effect.'" [8] *Id.* (quoting *Glaverbel*, 45 F.3d at 1558; *U.S. Philips*, 424 F.3d at 1184); *see also GoDaddy.com, LLC v. RPost Commc'ns Ltd.*, No. cv-14-00126-PHX-JAT, 2014 WL 6908507, at *5–*6 (D. Ariz. Dec. 9, 2014) (emphasizing that alleging bad faith is not enough, the pleadings must also include facts "that indicate an impermissible broadening of the Patent-in-Suit"). Leave is granted for Defendants to amend their pleading accordingly.

### (iii) The '765 patent

Defendants allege that ESCO committed patent misuse by asserting the '765 patent that expired in 2011 "despite knowing it could not prevail on a claim of infringement due to laches and/or estoppel," which they claim is an attempt to "impermissibly expand the temporal scope of the '765 patent." (Countercl. ¶¶ 30, 78). ESCO argues that it "is entitled to a presumption that its 'assertion of a duly granted patent is made in good faith.'" (Mot. to Dismiss 24 (quoting *C.R. Bard*, 157 F.3d at 1369)). And even if the patent did expire in 2011, it is within the scope of the patent right to sue for past damages during the statutorily prescribed limitations period. (*Id.* (citing *Genetics Institute, LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1299

---

[8] "A lawsuit is brought in bad faith only if 'the lawsuit is objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.'" *Nalco*, 2014 WL 645365, at *10 (quoting *Real Estate Investors*, 508 U.S. at 60). "A purpose is improper if its goal is not to win a favorable judgment, but to harass a competitor and deter others from competition, by engaging the litigation process itself, regardless of the outcome." *Glaverbel*, 45 F.3d at 1558 (citing *Real Estate Investors*, 508 U.S. at 60).

1  (Fed. Cir. 2011) ("[A]n expired patent may form the basis of an action for past damages subject

2  to the six-year limitation under 35 U.S.C. § 286.")))

3         The Court finds that Defendants' counterclaim for patent misuse, and the corresponding

4  affirmative defense, premised on the '765 patent should be dismissed.  The assertion of a patent

5  is exempt from the patent misuse defense absent a showing of bad faith. *Glaverbel*, 45 F.3d at

6  1558.  The bad faith element of Defendants' claim is based on the expired nature of the '765

7  patent.  However, the owners of expired patents are explicitly given six years after the expiration

8  date to pursue infringement claims. 35 U.S.C. § 286.  The assertion of a patent right provided by

9  statute clearly cannot serve as the basis for alleging that a patent holder has attempted to expand

10  the temporal scope of its patent in an anticompetitive manner.  The Court, therefore, finds that

11  the counterclaim and defense as they relate the '765 patent should be dismissed and stricken with

12  prejudice.

13              **(iv) The '684 patent, the '274 patent, the '693 patent, the '621 patent,**
                **the '765 patent, and the '472 patent**

14

15         Defendants' final allegations in support of their patent misuse defense are that ESCO

16  asserted all its patents-in-suit "in an effort to engage in forum shopping and to unlawfully

17  monopolize the market for hammerless retention systems or locks for ground engaging tools."

18  (Countercl. ¶ 79).  These allegations do not support the patent misuse defense.

19         Asserting a particular patent in an effort to litigate infringement claims in a specific

20  forum has absolutely nothing to do with the actual claims and limitations of the patent itself,

21  meaning its scope.  Simply seeking the most convenient forum for the plaintiff and least

22  convenient for the defendant is a matter of litigation tactics and not an attempt at broadening the

23  scope of the patent. *See Princo*, 616 F.3d at 1331 (stating that "patent misuse is about, in short, . .

24  . 'patent leverage,' i.e., the use of the patent power to impose overbroad conditions on the use of

1    the patent in suit").  While such a practice is undoubtedly frustrating and possibly wrong in the

2    eyes of a defendant, it is irrelevant under the patent misuse doctrine, which does not include all

3    "notion[s] of 'wrongful' use." *C.R. Bard*, 157 F.3d 1340.

4          Moreover, merely alleging that ESCO asserted the various patents-in-suit to unlawfully

5    monopolize the market does not equate to patent misuse.  A patent owner cannot be guilty of

6    misuse simply for seeking to enforce his patent rights against infringement. 35 U.S.C.

7    § 271(d)(3).  And even if the Court accepts the supposed "bad faith or improper purpose"

8    exception to this rule,  there are no facts accompanying Defendants' blanket conclusion that

9    would allow a reasonable inference that the suit was brought solely to harass Defendants without

10    regard to the ultimate outcome of the case. *See Glaverbel*, 45 F.3d at 1558.  These allegations are

11    not supportive of either the patent misuse counterclaim or affirmative defense.

12          Therefore, Defendants' counterclaim for patent misuse is dismissed, with leave to amend

13    only as to the '472 patent.  Leave to amend as to the other patents is not granted because the

14    Court finds that any such amendment would be futile.[9]  The Court also finds it necessary to strike

15    Defendants' sixth affirmative defenses for patent misuse.  While ESCO need only be given fair

16    notice of the theory underlying the defense, *Rockwell Automation*, 23 F. Supp. 3d at 1241–42,

17    the affirmative defense still fails in this regard.  The assertions made under Defendants' patent

18    misuse affirmative defense are similar to what is alleged under the counterclaim.[10]  However,

19

20    [9] Even if Defendants successfully amend the inequitable conduct claim as to the other asserted patents, leave to amend the misuse defense is not warranted.  As to the '684 patent and the '765 patent, Defendants present no

21    additional facts that indicate that amendment could overcome the deficiencies identified above.  As to the remaining patents, the wholesale conclusion that ESCO is seeking to monopolize the market and therefore has engaged in

22    misuse simply fails to convince the Court that amendment might somehow demonstrate that ESCO is solely pursing this litigation for the purpose of interfering with CAT's business with no regard for its outcome. *Glaverbel*, 45 F.3d at 1558.

23    [10] Defendants raise the defense because "ESCO Corp. prosecuted and obtained the '472 patent solely for the purpose of asserting it against the Defendants; ESCO Corp. asserted the '684 patent despite apparently not owning it; ESCO

24    Corp. asserted the expired '765 patent despite knowing it could not prevail on a claim of infringement due to laches and/or estoppel; and because Plaintiffs/Counterclaim Defendants asserted the '684, '274, '693, '621, '765, and '472

1    there are insufficient facts alleged that would give ESCO fair notice that the defense is not only

2    premised on ESCO attempting to enforce its patents, which alone is not actionable since it is

3    protected under 35 U.S.C. § 271(d)(3), but that it is also based on Defendants' claim that the

4    action was brought in bad faith or with improper purpose.  The affirmative defense needs to be

5    amended to reflect this basis to comport with Rule 8(c) and the notice requirement, and leave is

6    granted accordingly, but only as to the '472 patent.

### 3. Antitrust Claim under § 2 of the Sherman Act

8           "Intellectual property rights do not confer a privilege to violate the antitrust laws." *In re*

9    *Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000).  However, antitrust

10   laws also do not negate the patentee's right to exclude others from infringing its patent. *Id.*

11   (citing *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1362 (Fed. Cir. 1999)).  "A party is

12   ordinarily excempt from antitrust liability for bringing a lawsuit against a competitor.  That

13   principle is known as '*Noerr-Pennington* immunity' . . . ." *Tyco Healthcare Grp. LP v. Mut.*

14   *Pharm. Co.*, 762 F.3d 1338, 1343 (Fed. Cir. 2014).  For an antitrust claim to stand, there must be

15   a patent right that is coupled with violations of 15 U.S.C. § 2, and the elements of violation of

16   § 2 must be met. *In re Indep.*, 203 F.3d at 1325 (citing *Abbott Lab. v. Brennan*, 952 F.2d 1346,

17   1354 (Fed. Cir. 1991)).

18          Indeed, "a patent owner who brings suit to enforce the statutory right to exclude others

19   from making, suing, or selling the claimed invention is exempt from the antitrust laws, even

20   though such a suit may have an anticompetitive effect, unless the infringement defendant proves

21   one of two conditions." *Id.* at 1326.  "First, he may prove that the asserted patent was obtained

22   through knowing and willful fraud within the meaning of *Walker Process Equipment, Inc. v.*

23

24   patents in an effort to engage in forum shopping and to unlawfully monopolize the market for hammerless retention systems or locks for ground engaging tools." (Answer 23, ECF No. 137).

*Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965)." *Id.* "Or he may demonstrate that the infringement suit was a mere sham to cover what is actually no more than an attempt to interfere directly with the business relationships of a competitor." *Id.*

Defendants allege that ESCO violated § 2 of the Sherman Act "by obtaining patents through fraud and then knowingly enforcing the fraudulently obtained patents through bad faith litigation." (Countercl. ¶ 183). Defendants, therefore, base their counterclaim on both an allegation of *Walker Process* fraud as well as an allegation that the present lawsuit constitutes sham litigation.

### (i) *Walker Process* **fraud**

"To demonstrate *Walker Process* fraud, a claimant must make higher threshold showings of both materiality and intent than are required to show inequitable conduct." *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007). This is because *Walker Process* claimants are wielding the alleged misconduct "as a 'sword' to obtain damages rather than as a mere 'shield' against enforcement of the patent," which is the case under the defense of inequitable conduct. *Id.* at 1348; *see also Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1070 (Fed. Cir. 1998) ("Simply put, *Walker Process* fraud is a more serious offense than inequitable conduct.").

To successfully plead a *Walker Process* claim, the party must allege facts from which the court can infer that "(1) the patent at issue was procured by knowing or willful fraud on the USPTO; (2) the defendant was aware of the fraud when enforcing the patent; (3) there is independent evidence of a clear intent to deceive the examiner; (4) there is unambiguous evidence of reliance, *i.e.*, that the patent would not have issued but for the misrepresentation or omission . . . ." *Ritz Camera & Image, LLC v. SanDisk Corp.*, 772 F. Supp. 2d 1100, 1106 (N.D.

1   Cal. 2011) *aff'd*, 700 F.3d 503 (Fed. Cir. 2012) (citing *Nobelpharma*, 141 F.3d at 1068–71).

2   This must be done with the specificity required by Rule 9(b). *Medimmune*, 427 F.3d at 967.

3   Additionally, the plaintiff must allege the basic elements of an antitrust violation as defined by

4   the regional circuit's law.[11] *Dippin' Dots*, 476 F.3d at 1346–48.

5          Defendants' allegations regarding fraud on the PTO under the antitrust claim essentially

6   mirror what was alleged under the inequitable conduct claim.  In fact, the factual assertions

7   under the antitrust claim are far less specific than the assertions made in support of the

8   inequitable conduct claim.  For example, Defendants allege generally that "ESCO intentionally

9   perpetrated a series of frauds on the USPTO, both during the prosecution of the original

10  application that ultimately issued as the '621 patent and the related divisional '472 patent,"

11  (Countercl. ¶ 168), without attempting to satisfy any of the "who, what, where, when, or how"

12  requirements of Rule 9(b).

13         Presumably, this is because Defendants rest the antitrust fraud allegations on the facts "as

14  set forth above" under their claim of inequitable conduct. (*See* Countercl. ¶ 168).   Had

15  Defendants' pleading of inequitable conduct satisfied the *Exergen* standard, the Court would be

16  much more inclined to find plausibility as to fraud under the *Walker Process* claim.  However,

17  for the reasons articulated in the Court's analysis of Defendants' inequitable conduct claim, the

18  allegations of knowing and willful deception under this claim are insufficient as well.  It would

19  make little sense to allow the *Walker Process* claim to proceed when Defendants have

20  unsuccessfully pled the less serious offense of inequitable conduct. *See In re Lipitor Antitrust*

---

21
22  [11] Under Ninth Circuit caselaw, to state a claim for monopolization under § 2 of the Sherman Act, "a plaintiff must prove that: (1) the defendant possess monopoly power in the relevant market; (2) the defendant has willfully acquired or maintained that power; and (3) the defendant's conduct has caused antitrust injury." *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996).  To state a claim for attempted monopolization "a plaintiff must prove: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury." *Id.* at 950.

23
24

32

*Litig.*, 3:12-cv-2389, 2013 WL 4780496, at *19 (D.N.J. Sept. 5, 2013) (finding that where plaintiff's fraud theory was premised on the same allegations that failed to constitute inequitable conduct, it was "implausible to suggest that those allegations [met] the higher standard for stating a *Walker Process* claim").

There also seems to be no allegations as to independent evidence of ESCO, or more specifically, Schad's, clear intent to deceive the examiner. *Ritz Camera & Image*, 772 F. Supp. 2d at 1106. The failure to cite a piece of prior art will support a finding of *Walker Process* fraud only if accompanied by "evidence of fraudulent intent." *Nobelpharma*, 141 F.3d at 1059 ("A mere failure to cite a reference to the PTO will not suffice."). The discovery process may be necessary to secure such independent evidence, but the pleadings must contain some fact from which a court could reasonably infer that such evidence exists to be discovered. Conclusory assertions that ESCO acted "intentionally," "knowingly," or otherwise, without accompanying facts that imply a deliberate intent to defraud the PTO, do not meet the pleading standard.

Finally, Defendants allegation that "[b]ut for the misrepresentations made by ESCO's attorneys and inventors, as described above, the patents would not have issued," (Countercl. ¶ 169(f)), does not provide sufficient factual support for the "unambiguous" materiality of the alleged omissions. *Ritz Camera & Image*, 772 F. Supp. 2d at 1106. Again, had "but for" materiality been sufficiently alleged under the Defendants' inequitable conduct claim, the Court would be more inclined to find materiality properly alleged under the antitrust claim through the incorporation of the previous paragraphs contained in the pleading. Yet under the *Walker Process* claim, Defendants make no effort whatsoever to allege the materiality of the omitted

1    prior art beyond simply claiming it to be "material."[12]  Thus, Defendants fail to adequately plead

2    *Walker Process* fraud.

3                              **(ii) Sham litigation**

4           Sham litigation is another exception to *Noerr-Pennington* immunity, and it is "defined as

5    litigation that (1) is 'objectively baseless in the sense that no reasonable litigant could

6    realistically expect success on the merits' (the objective element), and (2) is motivated by a

7    desire 'to interfere *directly* with the business relationship of a competitor' (the subjective

8    element)." *Tyco*, 762 F.3d at 1343 (quoting *Real Estate Investors*, 508 U.S. at 60–61).

9           Defendants allege that CAT and other competing manufacturers entered the market for

10   hammerless retention systems for ground engaging tools in approximately 2009 and that ESCO

11   reacted to the competition "by engaging in anticompetitive and predatory activity designed to

12   exclude its competition (including [CAT]) from the market." (Countercl. ¶¶ 171–72).  Those

13   activities included refusing to fulfill certain CAT orders for a particular ground engaging tool

14   system manufactured by ESCO, to which the parties had contracted, and threatening CAT with

15   patent infringement if CAT "supplied its own hammerless locks for ground engaging tools,

16   known as CapSure®." (*Id.* ¶ 174).  The parties engaged in litigation initiated by CAT in Illinois

17   that sought resolution of the contract issue as well as declaratory judgement of non-infringement

18   _____

19   [12] Defendants cite *Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344 (Fed. Cir. 2007), in support of the argument that they have adequately pled *Walker Process* fraud.  In *Hydril*, the Federal Circuit found that the antitrust violation had been sufficiently pled where the complaint alleged that the patentee "had fraudulently obtained [its patent] by 'failing to disclose to the USPTO material prior art of which it was aware' (*which the complaint described*) and that [the patent] as issued would not have been granted had the patentee not omitted . . . the prior art." 474 F.3d at 1349 (emphasis added).  Unlike the complaint in *Hydril* that described the portions of prior art that were material to the asserted patent, Defendants here have not identified with particularity where in the prior art the material references are found and how the examiner would have potentially used them to find unpatentability.  Furthermore, *Hydril* was decided before *Exergen*, which clearly articulated the standard for pleading inequitable conduct under Rule 9(b). Given that "[a] finding of *Walker Process* fraud requires higher threshold showings of both intent and materiality than does a finding of inequitable conduct," *Nobelpharma*, 141 F.3d at 1070–71, it stands to reason that pleading an antitrust violation based on fraud would require at least as stringent a showing as pleading inequitable conduct under *Exergen. See Nalco*, 2014 WL 645365, at *6–7 (discussing the relationship between inequitable conduct and *Walker Process* fraud).  The Court, therefore, does not find that *Hydril* demands a different conclusion regarding the sufficiency of Defendants' pleadings.

                                      34

1    on certain ESCO patents.  (*Id.* ¶ 48).  The contract matter was settled but the non-infringement

2    issue was transferred to this District in late 2012. (*Id.* ¶ 52).

3           The transferred Illinois Action was then consolidated with the suit that ESCO had filed in

4    Nevada claiming infringement, which was subsequently transferred back to Illinois. (*Id.* ¶ 53).

5    While the case was pending in Illinois, ESCO obtained the '472 patent and initiated yet another

6    action in this District for infringement based thereon. (*Id.* ¶ 54).  The consolidated case that was

7    before the Illinois court was then retransferred to this District, assigned to this Court, and

8    consolidated with the '472 action.  Defendants claim that this was all done in an attempt "to

9    force [CAT] from the market by means of a costly lawsuit in a venue far from [CAT's] place of

10   business that involves several additional patents, parties, and products." (*Id.* ¶ 176).

11          The Court finds these allegations short of adequately pleading sham litigation so as to

12   overcome *Noerr-Pennington* immunity.  While these recited facts, along with Defendants'

13   numerous claims that ESCO has acted predatorily, may demonstrate that ESCO has taken an

14   aggressive position in the enforcement of its patents, the pleadings do not support an inference

15   that this litigation is "objectively baseless" such that ESCO could not "realistically expect

16   success on the merits." *Real Estate Investors*, 508 U.S. at 60–61.  In fact, Defendants do not even

17   allege that the litigation is actually baseless; rather, they simply contend that it was brought in

18   "bad faith." [13]

19          But pursuing litigation pursuant to duly issued patents does not constitute an antitrust

20   violation even if the specific intent and purpose is to exclude competitors from the patent

21

22   _____

23   [13] Even Defendants' allegations that ESCO attempted to coerce CAT from abandoning the CapSure® system by
     refusing to fulfill certain orders pursuant to a contract is not supportive of its antitrust claim under a theory of sham
     litigation.  The question is not whether ESCO has engaged in unsavory tactics generally, but whether the instant

24   litigation and asserted claims of infringement are objectively baseless and intended *only* as a means to interfere with
     Defendants' business regardless of the outcome. *Tyco*, 762 F.3d at 1343; *Glaverbel*, 45 F.3d at 1558.

property, as this is the monopoly inherent in the patent.[14] *See C.R. Bard*, 157 F.3d at 1369. Defendants, however, argue that the patents were not duly issued and were obtained through deliberate omissions to the PTO. This is the crux of their *Walker Process* claim, and as stated, the Court finds those allegations as currently pled insufficient to allow an inference of fraud.

Furthermore, the Court's finding that the pleadings fail to properly allege the objective baselessness of ESCO' infringement claims makes a review of its alleged intent to interfere with Defendants' business unnecessary. *Nobelpharma*, 141 F.3d at 1072. Indeed, "if a suit is not objectively baseless, an antitrust defendant's subjective motivation is immaterial." *Id.* If Defendants are unable to plead or eventually prove that this litigation is objectively baseless, it will be irrelevant to the sham litigation analysis whether ESCO's maneuverings amounted to a purposeful attempt to exclude Defendants from the wear-parts-with-hammerless-locks market.

Therefore, Defendants' claim pursuant to § 2 of the Sherman Act is dismissed as inadequately pled. The *Walker Process* allegations are insufficient under Rule 9(b) to allow a reasonable inference of knowing and willful fraud, and the sham litigation allegations fail to allege that the litigation is objectively baseless. Leave to amend the antitrust claim is granted to allow Defendants an opportunity to cure these deficiencies. Because Defendants have not sufficiently supported their claims and defenses as explained by the Court, ESCO's Motion to Dismiss and Motion to Strike are granted without prejudice. The Motion to Sever and the Motion to Stay are denied as moot.

///

///

---

[14] And the Court notes that the ultimate success or failure on an infringement claim in the face of an invalidity contention is not dispositive as to whether litigation is baseless; so even if Defendants prevail in their defense, it would not necessarily mean that ESCO had no basis for the action. *C.R. Bard*, 157 F.3d at 1368–69 ("stating that sham litigation requires more than a failed legal theory").

36

1   **III.   ESCO's Motion for Reconsideration**

2   **A. Legal Standard**

3       A motion for reconsideration must set forth "some valid reason why the court should

4   reconsider its prior decision" and set "forth facts or law of a strongly convincing nature to

5   persuade the court to reverse its prior decision." *Frasure v. United States*, 256 F. Supp. 2d 1180,

6   1183 (D. Nev. 2003).  Reconsideration is appropriate if this Court "(1) is presented with newly

7   discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or

8   (3) if there is an intervening change in controlling law." *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d

9   1255, 1263 (9th Cir. 1993).  "A motion for reconsideration is not an avenue to re-litigate the

10  same issues and arguments upon which the court already has ruled." *Brown v. Kinross Gold,*

11  *U.S.A.*, 378 F. Supp. 2d 1280, 1288 (D. Nev. 2005).

12  **B. Discussion**

13      The fact that ESCO disagrees with the Court's claim construction rulings does not

14  support the granting of its Motion.  The Court reached its findings and conclusions by evaluating

15  first and foremost the claim language itself, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13

16  (Fed. Cir. 2005), and where needed, by searching for additional clarification within the

17  specification, *see, e.g.*, *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.

18  1996) ("It is well-settled that, in interpreting an asserted claim, the court should look first to the

19  intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in

20  evidence, the prosecution history."); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979

21  (Fed. Cir. 1995) ("Claims must be read in view of the specification, of which they are a part.").

22  At no time did the Court ignore Federal Court precedent or base its rulings on improper

23  policy-driven reasons.  The Motion as a whole seems to be ESCO's attempt to merely reargue

24

the points raised during the *Markman* process with which the Court ultimately disagreed.  The Motion to Reconsider is denied.

## CONCLUSION

IT IS HEREBY ORDERED that ESCO's Motion to Dismiss (ECF No. 160) and Motion to Strike (ECF No. 164) are GRANTED as follows:

Defendants' inequitable conduct counterclaim (CAT Defendants' Count IV/Raptor Defendants' Third Claim for Relief) is dismissed without prejudice.  Leave to amend is granted as to all patents except the '684 patent and the '765 patent.  The Court finds that amendment would be futile as to these two patents.

Defendants' inequitable conduct affirmative defense (CAT Defendants' seventh affirmative defense/Raptor Defendants' seventh affirmative defense) is stricken with leave to amend as to all patents except the '684 patent and the '765 patent.

Defendants' patent misuse counterclaim (CAT Defendants' Count III) is dismissed without prejudice.  Leave to amend is granted only as to the '472 patent.

Defendants' patent misuse affirmative defense (CAT Defendants' sixth affirmative defense/Raptor Defendants' sixth affirmative defense) is dismissed without prejudice.  Leave to amend is granted only as to the '472 patent.

Defendants' antitrust counterclaim (CAT Defendants' Count VII) is dismissed without prejudice with leave to amend.

IT IS FURTHER ORDERED that ESCO's Motion to Sever (ECF No. 165) and Motion to Stay (ECF No. 166) are DENIED as moot.

///

///

1       IT IS FURTHER ORDERED that ESCO's Motion for Reconsideration (ECF No. 179) is

2  DENIED.

3       IT IS SO ORDERED.

4

5  Dated: This 26th day of January, 2016.

6

7                                  ROBERT C. JONES

8                           United States District Judge